AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

**EASTERN** **DISTRICT OF** **MASSACHUSETTS**

UNITED STATES OF AMERICA

**v.**

**FRANCESCO INSOLIA**
**ANA FIGUEROA**
**DILIA COSTA**
**GLORIA MELO**

## CRIMINAL COMPLAINT

CASE NUMBER: $07 m, 108-275$

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my

knowledge and belief. On or about **January 1, 2004 to on or about March 1, 2007** in **Bristol** County, in the

**Eastern** District of **Massachusetts** defendants, (Track Statutory Language of Offense)

did engage in a conspiracy to encourage or induce an alien to reside in the United States, knowing or in reckless disregard of the fact that such residence is or will be in violation of law, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I), and, in addition, did conspire to knowingly hire for employment in the United States an alien knowing the alien is an unauthorized alien, or to continue to employ an alien in the United States knowing the alien is or has become an unauthorized alien, in violation of Title 18, United States Code, Section 371.

I further state that I am a **Special Agent, ICE** and that this complaint is based on the following facts:
Official Title

See Attached Affidavit of ICE Special Agent Melvin Graham

Continued on the attached sheet and made a part hereof:  ☒ Yes  ☐ No

Signature of Complainant

Sworn to before me and subscribed in my presence,

March 5, 2007                    at    Boston, MA
Date                                              City and State

Honorable Leo T. Sorokin, United States Magistrate Judge
Name & Title of Judicial Officer                    Signature of Judicial Officer

JS 45 (5/97) - (Revised USAO MA 11/15/05)

| **Criminal Case Cover Sheet** | **U.S. District Court - District of Massachusetts** |
|---|---|

**Place of Offense:** New Bedford    **Category No.** II    **Investigating Agency** ICE

**City** New Bedford    **Related Case Information:**

**County** Bristol

Superseding Ind./ Inf. _____ Case No. _____
Same Defendant _____ New Defendant _____
Magistrate Judge Case Number _____
Search Warrant Case Number _____
R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name  FRANCESCO INSOLIA      Juvenile   ☐ Yes   ☒ No

Alias Name _____

Address  3 Country Club Circle, Pembroke, MA, 02359 _____

Birth date (Year only):  1956  SSN (last 4 #):  0731  Sex  M  Race:  WHITE \_\_\_\_ Nationality:  AMERICAN

**Defense Counsel if known:** _____ **Address:** _____

**Bar Number:** _____

**U.S. Attorney Information:**

**AUSA** Donald L. Cabell _____ **Bar Number if applicable** _____

**Interpreter:**   ☐ Yes ☒ No    **List language and/or dialect:** _____

**Victims:** ☐ Yes ☒ No    If Yes, are there multiple crime victims under 18 U.S.C. §3771(d)(2) ☐ Yes ☐ No

**Matter to be SEALED:**   ☒ Yes   ☐ No

☒ **Warrant Requested**    ☐ **Regular Process**    ☐ **In Custody**

**Location Status:**

**Arrest Date:** _____

☐ Already in Federal Custody as _____ in _____ .
☐ Already in State Custody _____ ☐ Serving Sentence   ☐ Awaiting Trial
☐ On Pretrial Release:   Ordered by _____ on _____

**Charging Document:**   ☒ Complaint    ☐ Information    ☐ Indictment

**Total # of Counts:**   ☐ Petty _____ ☐ Misdemeanor _____ ☒ Felony   2 _____

**Continue on Page 2 for Entry of U.S.C. Citations**

☐   I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
accurately set forth above.

**Date:**  March 5, 2007    **Signature of AUSA:** _____

**JS 45  (5/97) - (Revised USAO MA 11/15/05) Page 2 of 2 or Reverse**

District Court Case Number  (To be filled in by deputy clerk): _____

Name of Defendant        **FRANCESCO INSOLIA** _____

| | U.S.C. Citations | |
|---|---|---|
| **Index Key/Code** | **Description of Offense Charged** | **Count Numbers** |
| Set 1  **8 USC §1324(a)(1)(A)(v)** | Conspir. to induce alien to reside in U.S. | **1** |
| Set 2  **18 USC §371** | Conspir. to hire unauthorized alien | **2** |
| Set 3 | | |
| Set 4 | | |
| Set 5 | | |
| Set 6 | | |
| Set 7 | | |
| Set 8 | | |
| Set 9 | | |
| Set 10 | | |
| Set 11 | | |
| Set 12 | | |
| Set 13 | | |
| Set 14 | | |
| Set 15 | | |

**ADDITIONAL INFORMATION:**

ICE

&JS 45 (5/97) - (Revised USAO MA 11/15/05)

| **Criminal Case Cover Sheet** | **U.S. District Court - District of Massachusetts** |

**Place of Offense:**  New Bedford          **Category No.** II            **Investigating Agency** ICE

**City**  New Bedford                          **Related Case Information:**

**County**  Bristol                          Superseding Ind./ Inf.  _____     Case No.  _____
Same Defendant  _____   New Defendant  _____
Magistrate Judge Case Number  _____
Search Warrant Case Number  _____
R 20/R 40 from District of  _____

**Defendant Information:**

Defendant Name  ANA FIGUEROA                          Juvenile     ☐ Yes     ☒ No

Alias Name  _____

Address  158 Thompson Street, Apt. 2, New Bedford, MA 02740

Birth date (Year only):  1966  SSN (last 4 #):  9289  Sex  F  Race:     HISPANIC    Nationality:  AMERICAN

**Defense Counsel if known:**  _____     Address:  _____

**Bar Number:**  _____

**U.S. Attorney Information:**

**AUSA**  Donald L. Cabell                          **Bar Number if applicable**  _____

**Interpreter:**     ☐ Yes  ☒ No          **List language and/or dialect:**  _____

**Victims:**  ☐ Yes  ☒ No     If Yes, are there multiple crime victims under 18 U.S.C. §3771(d)(2)  ☐ Yes  ☐ No

**Matter to be SEALED:**     ☒ Yes     ☐ No

☒ **Warrant Requested**          ☐ **Regular Process**          ☐ **In Custody**

**Location Status:**

**Arrest Date:**  _____

☐ **Already in Federal Custody as**  _____  in  _____  .
☐ **Already in State Custody**  _____   ☐ **Serving Sentence**     ☐ **Awaiting Trial**
☐ **On Pretrial Release:**   **Ordered by**  _____  on  _____

**Charging Document:**     ☒ **Complaint**          ☐ **Information**          ☐ **Indictment**

**Total # of Counts:**     ☐ **Petty**  _____     ☐ **Misdemeanor**  _____     ☒ **Felony**  2

Continue on Page 2 for Entry of U.S.C. Citations

☒     I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
accurately set forth above.

**Date:  March 5, 2007**          **Signature of AUSA:**

JS 45 (5/97) - (Revised USAO MA 11/15/05) Page ~ ~f ~ ~~ ~~~~~~~

District Court Case Number  (To be filled in by deputy clerk): _____

Name of Defendant      **ANA FIGUEROA** _____

**U.S.C. Citations**

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| **Set 1**   **8 USC §1324(a)(1)(A)(v)** | **Conspir. to induce alien to reside in U.S.** | **1** |
| **Set 2**   **18 USC §371** | **Conspir. to hire unauthorized alien** | **2** |
| Set 3 _____ | _____ | _____ |
| Set 4 _____ | _____ | _____ |
| Set 5 _____ | _____ | _____ |
| Set 6 _____ | _____ | _____ |
| Set 7 _____ | _____ | _____ |
| Set 8 _____ | _____ | _____ |
| Set 9 _____ | _____ | _____ |
| Set 10 _____ | _____ | _____ |
| Set 11 _____ | _____ | _____ |
| Set 12 _____ | _____ | _____ |
| Set 13 _____ | _____ | _____ |
| Set 14 _____ | _____ | _____ |
| Set 15 _____ | _____ | _____ |

**ADDITIONAL INFORMATION:**

**ICE**

JS 45 (5/97) - (Revised USAO MA 11/15/05)

| **Criminal Case Cover Sheet** | **U.S. District Court - District of Massachusetts** |

**Place of Offense:** New Bedford   **Category No.** II   **Investigating Agency** ICE

**City** New Bedford   **Related Case Information:**

**County** Bristol

Superseding Ind./ Inf. _____   Case No. _____
Same Defendant _____   New Defendant _____
Magistrate Judge Case Number _____
Search Warrant Case Number _____
R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name  DILIA COSTA   Juvenile   ☐ Yes   ☒ No

Alias Name _____

Address   43 Sherman Street, New Bedford, Massachusetts, 02740

Birth date (Year only):  1952  SSN (last 4 #):  4767  Sex  F  Race:   WHITE   Nationality:  AMERICAN

**Defense Counsel if known:** _____   **Address:** _____

**Bar Number:** _____

**U.S. Attorney Information:**

**AUSA**  Donald L. Cabell   **Bar Number if applicable** _____

**Interpreter:**   ☐ Yes  ☒ No   **List language and/or dialect:** _____

**Victims:**  ☐ Yes  ☒ No   If Yes, are there multiple crime victims under 18 U.S.C. §3771(d)(2)  ☐ Yes  ☐ No

**Matter to be SEALED:**   ☒ Yes   ☐ No

☒ **Warrant Requested**   ☐ **Regular Process**   ☐ **In Custody**

**Location Status:**

**Arrest Date:** _____

☐ **Already in Federal Custody as** _____ in _____ .
☐ **Already in State Custody** _____   ☐ **Serving Sentence**   ☐ **Awaiting Trial**
☐ **On Pretrial Release:**   Ordered by _____ on _____

**Charging Document:**   ☒ **Complaint**   ☐ **Information**   ☐ **Indictment**

**Total # of Counts:**   ☐ **Petty** _____   ☐ **Misdemeanor** _____   ☒ **Felony**  2

**Continue on Page 2 for Entry of U.S.C. Citations**

☒   I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
accurately set forth above.

**Date:**  March 5, 2007   **Signature of AUSA:** _____

JS 45 (5/97) - (Revised USAO M.

District Court Case Number  (To be filled in by deputy clerk): _____

Name of Defendant      DILIA COSTA _____

|  | U.S.C. Citations | |
| --- | --- | --- |
| **Index Key/Code** | **Description of Offense Charged** | **Count Numbers** |
| Set 1   8 USC §1324(a)(1)(A)(v) | Conspir. to induce alien to reside in U.S. | 1 |
| Set 2   18 USC §371 | Conspir. to hire unauthorized alien | 2 |
| Set 3 | | |
| Set 4 | | |
| Set 5 | | |
| Set 6 | | |
| Set 7 | | |
| Set 8 | | |
| Set 9 | | |
| Set 10 | | |
| Set 11 | | |
| Set 12 | | |
| Set 13 | | |
| Set 14 | | |
| Set 15 | | |

**ADDITIONAL INFORMATION:**

ICE

JS 45 (5/97) - (Revised USAO MA 11/15/05)

**Criminal Case Cover Sheet**          **U.S. District Court - District of Massachusetts**

**Place of Offense:** New Bedford    **Category No.** II      **Investigating Agency** ICE

**City** New Bedford       **Related Case Information:**

**County** Bristol

Superseding Ind./ Inf. _____ Case No. _____
Same Defendant _____ New Defendant _____
Magistrate Judge Case Number _____
Search Warrant Case Number _____
R 20/R 40 from District of _____

**Defendant Information:**

Defendant Name   GLORIA MELO          Juvenile    ☐ Yes    ☑ No

Alias Name _____

Address   135 Sprague Street, Fall River, Massachusetts, 02724

Birth date (Year only):   1965   SSN (last 4 #):   6528   Sex  F  Race:   WHITE    Nationality:   AMERICAN

**Defense Counsel if known:** _____ **Address:** _____

**Bar Number:** _____ _____

**U.S. Attorney Information:**

**AUSA** Donald L. Cabell          **Bar Number if applicable** _____

**Interpreter:**    ☐ Yes  ☑ No      **List language and/or dialect:** _____

**Victims:** ☐ Yes ☑ No    If Yes, are there multiple crime victims under 18 U.S.C. §3771(d)(2) ☐ Yes ☐ No

**Matter to be SEALED:**    ☑ Yes    ☐ No

     ☑ **Warrant Requested**      ☐ **Regular Process**      ☐ **In Custody**

**Location Status:**

**Arrest Date:** _____

☐ **Already in Federal Custody as** _____ **in** _____ .
☐ **Already in State Custody** _____ ☐ **Serving Sentence**    ☐ **Awaiting Trial**
☐ **On Pretrial Release:**   **Ordered by** _____ **on** _____

**Charging Document:**    ☑ **Complaint**    ☐ **Information**    ☐ **Indictment**

**Total # of Counts:**    ☐ **Petty** _____ ☐ **Misdemeanor** _____ ☑ **Felony**   2 _____

**Continue on Page 2 for Entry of U.S.C. Citations**

☒   I hereby certify that the case numbers of any prior proceedings before a Magistrate Judge are
    accurately set forth above.

**Date:**   March 5, 2007       **Signature of AUSA:** _____

JS 45 (5/97) - (Rev

**District Court Case Number** (To be filled in by deputy clerk): _____

**Name of Defendant**    **GLORIA MELO** _____

**U.S.C. Citations**

| Index Key/Code | Description of Offense Charged | Count Numbers |
|---|---|---|
| Set 1   8 USC §1324(a)(1)(A)(v) | Conspir. to induce alien to reside in U.S. | 1 |
| Set 2   18 USC §371 | Conspir. to hire unauthorized alien | 2 |
| Set 3 | | |
| Set 4 | | |
| Set 5 | | |
| Set 6 | | |
| Set 7 | | |
| Set 8 | | |
| Set 9 | | |
| Set 10 | | |
| Set 11 | | |
| Set 12 | | |
| Set 13 | | |
| Set 14 | | |
| Set 15 | | |

**ADDITIONAL INFORMATION:**

ICE

**AFFIDAVIT**

I, Melvin H. Graham, having been duly sworn, hereby depose and state:

1. I am employed as a Special Agent, United States Department of Homeland Security, Immigration and Customs Enforcement (ICE), and have been so employed for approximately 18 years, since June of 1988. Prior to that, I was employed by the U.S. Marshals Service as a Deputy U.S. Marshal, from 1980 to 1988. I am currently assigned to the National Security Group (NSG) in the Boston, Massachusetts Field Office.

2. I am aware based on my training and experience that aliens seeking to work in the United States must first obtain authorization to do so. Similarly, an employer seeking to hire an alien has an obligation to ensure that the alien is authorized to work in the United States. As part of this process, the alien must provide the employer with certain documents proving the alien's identity and eligibility to work. Typically, these documents include a Resident Alien card, known formally as Form I-551 and informally as a "green card," or an Employment Authorization card, known formally as Form I-766, and a Social Security Account Number card ("social security card"). Generally, aliens who are legally present in the United States may apply for these documents. From my training and experience, however, I know that aliens who are illegally present in the United States, and who thus do not have permission to work,

sometimes purchase counterfeit green cards and social security
cards and other false documentation.

3.     I am aware based on my training and experience that
Title 8, United States Code, Section 1324(a)(1)(A)(iv) makes it a
crime to encourage or induce an alien to reside in the United
States knowing or in reckless disregard of the fact that such
residence is or will be in violation of law, and that Title 8,
United States Code, Section 1324(a)(1)(A)(v)(I) makes it a crime
to engage in any conspiracy to violate section 1324(a)(1)(A)(iv).
I am further aware that Title 8, United States Code, Sections
1324a(a)(1) and (a)(2), make it a crime for anyone to hire an
alien for employment in the United States knowing the alien is an
unauthorized alien or, after hiring an alien, to continue to
employ the alien knowing the alien is (or has become) an
unauthorized alien, and that Title 18, United States Code,
Section 371, makes it a crime to conspire to knowingly hire or
continue to employ an unauthorized alien in violation of 8 U.S.C.
§§ 1324a(a)(1) or (a)(2).

4.     Having so stated, I make this affidavit in support of a
criminal complaint charging four employees of a New Bedford
company named Michael Bianco, Inc. ("MBI"), with violating 8
U.S.C. §1324(a)(1)(A)(v)(I) by conspiring from on or about
January 1, 2004, to on or about March 1, 2007, to encourage or
induce aliens to reside in the United States, knowing or in

2

reckless disregard of the fact that such residence is or will be in violation of law, and violating 18 U.S.C. § 371 by conspiring during the same time period to knowingly hire or continue to employ unauthorized aliens. They include (1) MBI's founder and president, Francesco INSOLIA, (2) MBI's payroll manager, Ana FIGUEROA, (3) MBI's plant manager, Dilia COSTA, and (4) MBI's office manager, Gloria MELO. Based on our investigation, ISOLIA has been with MBI since 1985; FIGUEROA has been with MBI since at least October, 2005; and COSTA and MELO have been with MBI since before January, 2004. (To be clear, I am aware that another MBI employee named Paula McGinn appears also to have the title of payroll manager.)

5. The statements contained in this affidavit are based on my own investigation as well as on information provided to me by other ICE agents, and agents, officers and employees from the Office of Inspector General/Social Security Administration, Department of Defense, the Massachusetts State Police and the Insurance Fraud Bureau of Massachusetts. Because this affidavit is being submitted for the limited purpose of obtaining a criminal complaint against INSOLIA, FIGUEROA, COSTA and MELO, I have not included each and every fact known to me concerning this investigation, but only those facts that I believe are necessary to establish probable cause to believe that each named individual has violated 8 U.S.C. § 1324(a)(1)(A)(v)(I) and 18 U.S.C. § 371.

3

6. INSOLIA established MBI in 1985. MBI specializes in the manufacture of handbags and other fine leather goods. The company manufactures its own line of products but has also in the past manufactured handbags, travel bags, backpacks, business cases and other travel and business accessories for other companies, including, among others, Coach, Fossil, G.H. Bass, Mark Cross, Rockport and Timberland.

7. In or around 2001 and 2002, INSOLIA employed approximately 85 people at MBI. Around that time, and continuing into 2003, INSOLIA bid for, and ultimately received, a number of Department of Defense contracts worth approximately ten million dollars to manufacture certain products for the United States military. These included, among others, a contract to manufacture Aircrew Integrated Recovery Survival, Armor Vest and Equipment (AIRSAVE), valued at more than $4.2 million, and a contract to manufacture Air Crewmen's Survival Vests, valued at more than $5.2 million. In or around 2004, INSOLIA significantly expanded MBI's operations when MBI received a much larger contract to manufacture Modular Lightweight Load-Carrying Equipment Backpack Systems (MOLLE), worth almost $82 million.

8. Based on our investigation, MBI's workforce increased substantially as a result of its receipt of these contracts. From 2001 through 2003, for example, and based on records and information MBI submitted to the Social Security Administration,

4

MBI had approximately 85 employees. In 2004, MBI almost quadrupled in size and had approximately 325 employees. MBI continued to grow and in 2005 had approximately 520 employees. Presently, MBI employs well over 500 people. The overwhelming majority of these positions appear to be relatively low-paying floor level positions, including markers and cutters, sewers, solderers, packers, and shippers. Based on our investigation, the average employee working in one of these positions is paid approximately $7.20 per hour, and receives no benefits.

9. In or around May of 2006, we received information from an MBI employee, referred to hereafter as the "cooperating witness" or "CW." The CW, who is willing to testify regarding its observations and knowledge, knows and has interacted with MBI employees at all levels of the company, including management level employees and INSOLIA himself. The CW stated that INSOLIA and other MBI employees working on his behalf have knowingly and actively and, indeed, specifically been hiring illegal aliens to fill their expanding workforce. According to the CW, although MBI requires all prospective employees to produce proof of their identity and their eligibility to work, the company is aware that many employees have obtained counterfeit green cards and social security cards, and some MBI management level employees have even instructed prospective employees on how to go about obtaining such documents.

10. The CW stated that it became aware of the magnitude of this practice in or around December of 2005. The CW stated that it was at work at MBI one day in or around December of 2005 when other MBI employees reported that ICE officials were at that moment conducting an investigation at a nearby New Bedford company to determine if the business was employing illegal aliens or individuals without employment authorization documents. The CW stated that many employees openly worried that ICE officials might also come to MBI. Subsequently, Dilia COSTA, MBI's plant manager, announced over the loud speaker that INSOLIA had stated that all employees were free to leave the building. According to the CW, approximately 75 individuals ran and hid. Some hid in their vehicles and others hid in boxes on the third floor at MBI.

11. In addition to information provided by the CW, I am aware that on August 18, 2006, Massachusetts State Police stopped a woman named Susana Gutierrez-Lima for a driving infraction. Officials subsequently determined that Ms. Gutierrez-Lima is a native of El Salvador who entered the country illegally and never applied for or received authorization to work in the United States. When stopped, however, Ms. Gutierrez-Lima had a counterfeit green card and social security card in her possession, and she subsequently told ICE officials that she had been working at MBI since February of 2006.

12. On September 7, 2006, and based on the foregoing, we

6

sent a female ICE special agent working in an undercover capacity (the "UCA") to MBI posing as an illegal alien seeking a job. Posing as a Mexican woman named Yolanda Ramos-Mendez, the UCA met with a woman named "Ana," later determined to be Ana FIGUEROA, MBI's payroll manager. FIGUEROA gave the UCA an employment application and told her to return two days later to take a sewing test. In the course of their conversation, which was recorded, the UCA told FIGUEROA that she did not have any papers to work in the United States, signaling that she was not in the country legally; in my experience, and based on conversations with others, employers who work with immigrants or non-citizens understand that not having "papers" is synonymous with being in the United States illegally.

13.  The UCA gave FIGUEROA a fabricated Mexican Consular card which bore a photograph of the UCA in the name of Yolanda Ramos-Mendez and listed a California address. Figueora told the UCA that she would also need a social security number, and stated the UCA could buy one from an MBI employee named "Felix" (last name unknown) for about $60.00. Much of this conversation, as with others the UCA would have with MBI management level employees, took place in Spanish. Among other things, FIGUEROA told the UCA, "el les consigue los papeles," which means "he is the one that obtains the papers." FIGUEROA then told the UCA "usted no oyo eso de me," which means "you didn't hear that from

7

me." Another MBI employee, a floor supervisor named Mario Escote, told the UCA that she also could go to "see 'Luis' across the street" at a nearby music store named Aries Record Shop and obtain fraudulent documents there.

14. After the UCA was unable to find Felix, we directed the CW to find the UCA and to take her to Aries Record Shop, which is located nearby at 971 Brock Avenue in New Bedford, MA. The two went there later that day on September 7, 2006. A man named Luis Torres greeted the UCA and CW. The UCA told Torres that she needed to obtain an alien registration card and a social security card. The UCA gave Torres passport-type photographs of herself and a copy of her signature exemplar. On the following day, September 8th, the CW went to Aries Record Shop on the UCA's behalf and Torres produced for the CW a counterfeit alien registration card that bore the passport-type photograph of the UCA, and one counterfeit social security card bearing the name Yolanda Ramos. Both cards also bore a forged signature of the UCA's undercover name. The CW paid $120.00 for the documents.

15. On September 9, 2006, the UCA took and passed a sewing test at MBI, and was instructed to report to work as a seamstress at MBI on Monday, September 11, 2006. Accordingly, on Monday, September 11, 2006, the UCA reported to work at 89 West Rodney French Boulevard, at approximately 7:00 a.m. As she stood outside the building waiting for it to open, the UCA met two

8

Hispanic males. The two men spoke with the UCA in Spanish and told her that they were hoping to be hired by MBI. One man told the UCA that he was from Honduras and that he was in the United States "without papers" and had no form of identification. The UCA subsequently learned that FIGUEROA hired the two men. The UCA observed FIGUEROA completing their employment applications for them and was able to see that one of the men was named Carlos Rosas, from Honduras.

16. After entering the building on September 11th, the UCA met with FIGUEROA to formally complete an employment application. In the course of their meeting, which was recorded and in Spanish, the UCA gave FIGUEROA the fraudulent alien registration and social security cards that she had purchased from Torres. FIGUEROA programmed the UCA's name into MBI's system so that she could receive a time card to "punch in." FIGUEROA also returned the fraudulent alien registration and social security cards to the UCA and told her they were no longer needed.

17. On September 12, 2006, the UCA met a female MBI employee named Antonia Mejia. Mejia told the UCA that she is from Mexico and had illegally entered the United States two years earlier.

18. On September 13, 2006, the UCA met with MBI's plant manager, Dilia COSTA. During the conversation, which was recorded and in Spanish, but translated here, the following

9

exchange occurred:

> UCA: I want to thank you for giving me a job
> here.  I understand you are the supervisor
> here?
>
> COSTA: Yes, I am.
>
> UCA: I'm here from Mexico.
>
> COSTA: Mexico, that's great!
>
> UCA: You know I'm here illegally.
>
> COSTA: Yes, exactly.
>
> UCA: Do you think if my family comes here
> from Mexico you can give them jobs if they
> know how to sew?
>
> COSTA: unintelligble...Yes, they have to know
> how to sew, know the machines, and sewing is
> a must.
>
> UCA: Without papers to work legally?
>
> COSTA: No, they have to have papers to work.
>
> UCA: Even false papers?
>
> COSTA: False, yes.

19.  The UCA worked at MBI on September 13, 2006, from 7:30
a.m. to 4:00 p.m.  During that time, the UCA met with and
ascertained the identities of at least seven (7) MBI employees
who told the UCA that they were illegally present in the United
States: (1) Paulina Coshik, 26, from Guatemala, (2) Morena
Alvarado, 25, from El Salvador, (3) Manuel Sam, 20, from Central
America, (4) Marisa Ramos, age and country unknown, (5) Carlos,
last name unknown (LNU), 45-50, from Guatemala, (6) Rissy Reyes,

10

age unknown, from Honduras, and (7) Altagracia LNU, age unknown, from the Dominican Republic.

20. On September 14, 2006, the UCA went to MBI's personnel office and spoke with Gloria MELO, MBI's office manager; the conversation was recorded and in Spanish. Among other things, the UCA asked MELO whether she could be paid at the end of the week because she was in the country without papers and had no money to eat or a place to live. MELO did not express any concern over the UCA's statements and told her that she would be paid.

21. The UCA subsequently met that same day with INSOLIA in INSOLIA's office. Similar to her conversations with other MBI management level employees, the conversation was recorded and conducted principally in Spanish. Among other things, the UCA asked INSOLIA whether she could receive payment for the work she had already performed. When INSOLIA initially balked, the UCA explained that she needed the money now because she had come a long way, had no money, food, or a place to live, and was in the U.S. without papers. INSOLIA then told the UCA: "*Todo el mundo tiene papeles,*" which means "everyone has papers." The UCA interpreted this statement to mean that all MBI employees, including even those who were not authorized to work, were required to, and somehow did, obtain documents that appeared to authorize the employee to work in the United States. INSOLIA

11

then asked the UCA where she was from and she told him that she was from Mexico. INSOLIA's only response to this statement was to inform the UCA that he owned a company in Leon, Guanajuato, in Mexico, and to ask her whether she knew where that was, to which she answered negatively. INSOLIA subsequently called a person named "Paula," whom our investigation has determined to be Paula McGinn, MBI's payroll manager, and asked her to cut a check for the UCA in the amount of $150.00.

22. Later in the day on September 14, 2006, the UCA met with FIGUEROA and told her that she had paid $1,500.00 to be smuggled from Mexico into the United States. The UCA told FIGUEROA that she was trying to find a place to live and that she would like to work overtime in order to earn more money. FIGUEROA responded that many of the people at MBI also owed money to someone for having been smuggled into the country, and that some had paid as much as $5,000.00 to $6,000.00 to be smuggled into the United States from places like Honduras and Guatemala.

23. The UCA did not return to MBI after September 14, 2006. In the course of her four day tenure there, however, INSOLIA, FIGUEROA, COSTA and MELO all assisted the UCA in either obtaining or continuing her employment at MBI despite understanding or being told by the UCA that she had recently come to the United States, from Mexico, illegally, and without papers. FIGUEROA, the payroll manager, told the UCA that she could assist the UCA

12

in obtaining a false social security card and referred her to an
MBI employee named Felix. COSTA, the plant manager, did not
express any concern upon being informed by the UCA that she had
entered the United States illegally, and told the UCA that MBI
would consider hiring the UCA's family members if they were able
to illegally enter the United States from Mexico. MELO, the
office manager, assured the UCA she would be paid (rather than
terminated) when the UCA effectively admitted to being an illegal
alien when she told MELO that she needed money because she had no
papers and no place to live. Similarly, INSOLIA assisted the UCA
in getting an advance on her pay even after the UCA told him that
she needed money because she had recently come from Mexico and
had no papers.

24. Moreover, a random check of the registration of several
vehicles in MBI's employee parking lot suggests that many
employees are either illegal aliens or aliens who are not
authorized to work. After conducting surveillance of the parking
lot on May 5, 2006, and May 26, 2006, we recorded the license
plate numbers of several vehicles with Massachusetts or Rhode
Island license plates, and then examined the pertinent
Massachusetts and Rhode Island registry records for each. We
then compared and cross-checked those records with records that
ICE maintains on all aliens in the United States. Our
investigation revealed the following with respect to 11 of the

13

vehicles:

  a. Two of the vehicles were registered to a man named Andres Ciprian, of Providence, RI. ICE records indicate that Ciprian is a citizen of Guatemala who illegally entered the United States through Douglas, Arizona on January 24, 2004, and was deported from the United States on March 29, 2004. He has never sought or obtained authorization to work in the United States;

  b. A third vehicle was registered to a man named Jose Tamup, of Providence, RI. ICE records indicate that Tamup is a citizen of Guatemala who entered the country on February 24, 1999 and was ordered removed on June 29, 1999. He has never sought or obtained authorization to work in the United States;

  c. A fourth vehicle was registered to a woman named Rosario Hernandez, of Providence, RI. ICE records indicate that Hernandez is from Mexico and was removed from the country on February 24, 1999. She has never sought or obtained authorization to work in the United States;

  d. A fifth vehicle was registered to a man named Esteban Ruiz, of Providence, RI. ICE has no records reflecting Ruiz is in the country illegally but there is also no indication he has ever sought or obtained permission to work in the United States;

  e. A sixth vehicle was registered to a woman named Maria L. Toj, of Providence, RI. ICE records indicate that Toj is a citizen of Guatemala. Toj previously was in the country legally and was authorized to work, but her authorization to work expired on April 12, 2006;

  f. A seventh vehicle was registered to Maria Linares of New Bedford, MA. ICE records indicate that Linares is a citizen of El Salvador. She legally entered the United States and was authorized to work but her authorization expired on March 9, 2005;

  g. An eighth vehicle was registered to a woman named Kinjal Pandya of Fall River, MA. ICE records indicate that Pandya is a citizen of India who entered the country legally in 2000. However, there is no indication that Pandya ever sought or obtained authorization to work in the United States;

14

h.   A ninth vehicle was registered to a man named Sergio
     Viviani of Fall River, MA.  ICE records indicate that
     Viviani, a citizen of Brazil, entered the United States
     legally on December 9, 2005, but there is no indication
     he ever sought or obtained authorization to work in the
     United States.  During a previous stay in the United
     States, Viviani was granted authorization to work on
     August 5, 1998, but that authorization had ended on
     July 16, 1999;

i.   A tenth vehicle was registered to a man named Pedro
     Contreras, of New Bedford, MA.  ICE records indicate
     that Contreras is a citizen of the Dominican Republic.
     Contreras originally entered the country legally but he
     overstayed his visa and his authorization to work in
     the United States expired on April 25, 2005; and

j.   The eleventh vehicle was registered to a woman named
     Ada Rivas of New Bedford, MA.  ICE records indicate
     that Rivas is a citizen of El Salvador who entered the
     United States in 1998.  There is no record of a
     departure and her employment authorization expired on
     September 11, 2003.

25.   In addition to our surveillance and information

obtained from the CW and UCA, I am also aware that the Social

Security Administration (the "SSA") has since at least 2002 been

sending correspondence to MBI informing the company that many of

the social security numbers ("SSN's") that MBI has provided to

the SSA pursuant to annual reporting requirements appeared to be

fraudulent or otherwise invalid.  More specifically, employers

must submit annual Wage and Tax Statements (Forms W-2) for their

employees to the SSA and these forms contain the employees'

SSN's.  The SSA in turn reviews the SSN's to ensure they are

accurate.  In cases where there appear to be problems or

discrepancies, the SSA sends correspondence to the employer

listing the particular SSN's at issue. These letters, referred
to as "no match" letters, also request that the employer obtain
and provide corrected W-2 forms and SSN's to the SSA.

26. Notably, the SSA does not deem it necessary to send a
"no match" letter to an employer unless the number of deficient
SSN's reported by the employer exceeds one half of one percent of
the employer's workforce. Accordingly, anything greater than
that amount is sufficiently important to the SSA to warrant the
sending of the "no match" letter. As summarized below, the
number of deficient SSN's reported by MBI each year since 2002
has consistently greatly exceeded one half of one percent of
MBI's workforce, and in 2006 was equal to almost 66 percent of
the company's total workforce. Although it does not appear that
the SSA specifically addressed the letters it sent to MBI to any
specific MBI employee, the letters were nonetheless sent to MBI,
and it is reasonable to infer that INSOLIA, as the president,
either read the letters and shared the information with his
managers (FIGUEROA, COSTA, MELO and Paula McGinn the payroll
manager), or was informed of the "no match" letters by one of his
managers.

27. On or about February 11, 2002, MBI reported 83 W-2
payroll records to the SSA for the tax year 2001, indicating that
MBI employed about 83 people during 2001. The SSA determined
that 19 of the SSN's reported, reflecting about 23% of the

16

workforce, were deficient in some manner. Eight of the SSN's
were invalid and 11 did not match the true name recorded with the
SSA for that SSN. Of those 11 that did not match the name, three
belonged to adolescents who were born at some point between
January of 1991 and the present. The SSA sent MBI a "no match"
letter listing the 19 SSN's at issue but MBI never responded to
the letter.

28. On or about February 5, 2003, MBI reported 85 W-2
payroll records to the SSA for the tax year 2002. The SSA
determined that 11 of the SSN's reported, reflecting about 13% of
the workforce, were deficient in some manner. Five of the SSN's
were invalid and six did not match the true name recorded with
the SSA for that SSN. Of those six that did not match, two
belonged to adolescents who were born at some point between 1991
and the present. The SSA sent MBI a "no match" letter listing
the 11 SSN's at issue but MBI never responded to the letter.

29. On or about February 3, 2004, MBI reported 85 W-2
payroll records for the tax year 2003. The SSA determined that
ten of the SSN's reported were deficient in some manner. Five of
the SSN's were invalid and five did not match the true name
recorded with the SSA for that SSN. Of the five that did not
match, one belonged to an adolescent born between 1991 and the
present. The SSA sent MBI a "no match" letter listing the 10
SSN's at issue but MBI never responded to the letter.

30. For the tax year 2004, MBI submitted records to the SSA on two different occasions. Initially, on February 1, 2005, MBI reported 151 W-2 payroll records. Of these, 36 SSN's were deficient in some manner. 16 of the SSN's were invalid and 20 did not match the true name recorded with the SSA for that SSN. Of those 20 that did not match, four belonged to adolescents born between 1991 and the present, and three belonged to individuals who were deceased. The SSA accordingly sent MBI a "no match" letter on or about March 10, 2005. On March 31, 2005, and apparently in response, MBI submitted records reporting 326 W-2 payroll records. Of these, 142 records, or 44% of those submitted, were deficient in some manner. 61 of the SSN's were invalid and 81 did not match the true name recorded with the SSA for that SSN. Of those 81 that did not match, 17 belonged to adolescents born between 1991 and the present, and 21 belonged to individuals who were deceased. The SSA sent MBI another "no match" letter on May 12, 2005, but MBI did not respond to it.

31. On or about February 2, 2006, MBI submitted 521 W-2 payroll records for the tax year 2005. Of these, 301, or 58% of the records submitted, were deficient in some manner. 154 of the SSN's were invalid and 147 did not match the true name recorded with the SSA for that SSN. Of those 147 that did not match, 33 belonged to adolescents born between 1991 and the present, and 27 belonged to individuals who were deceased. The SSA sent MBI

another "no match" letter on or about March 10, 2006, but MBI did not respond to it.

32. Based on my investigation, many of the deficient SSN's that MBI reported in a given year, prompting a "no match" letter informing MBI of the deficient SSN's at issue, were also reported by MBI the following year, prompting another "no match" letter containing the same deficient SSN's among others. Of the 142 deficient SSN's that MBI reported for the tax year 2004, for example, 108 were also reported by MBI for the tax year 2005. Consistent with what the CW and UCA stated, the data strongly suggest that INSOLIA and his managers continued to employ individuals despite having good reason to believe they were illegal aliens.

33. Indeed, according to the CW, in or around late December, 2006, three older female floor workers at MBI who are citizens or legal permanent residents went to see FIGUEROA about getting jobs for their grandchildren, who also are citizens or legally in the country. According to the CW, FIGUEROA told the women that MBI would not hire their grandchildren because INSOLIA only wanted to hire illegal aliens. Similarly, approximately one week later, MELO expressed frustration that she had been unable to obtain a position at MBI for a friend because of Francesco's preference for illegal aliens. According to the CW, MELO angrily yelled at an MBI Hispanic employee words to the effect that

19

because of "you f\*\*king people, we are losing our rights and job; I tried to get a job for somebody and I couldn't because Francesco [INSOLIA] said 'no.'"

34.   More recently, on or about February 1, 2007, MBI submitted 646 W-2 payroll records for the tax year 2006.  Of those, the SSA has preliminarily determined that 428 of the SSN's, or about 66% of the records submitted, are deficient in some manner.  Because these records were just recently submitted, however, the SSA has not yet sent MBI a "no match" letter.  In light of the foregoing, however, including FIGUEROA's recent unwillingness to hire citizens or residents at MBI given INSOLIA's stated preference for illegal aliens, and MELO's outburst demonstrating her awareness of the practice, it is reasonable to infer that INSOLIA, FIGUEROA, COSTA and MELO have knowingly and specifically been hiring large numbers of illegal aliens since 2004, and that most if not all of the MBI employees associated with these 428 deficient SSN's are illegal aliens not authorized to work or to reside in the United States.

35.   MBI presently maintains a workforce of more than 500 people and I believe the majority of this workforce continues to consist of illegal aliens or aliens who are not authorized to work in the United States.  On February 1, 2007, I surveilled MBI's premises from approximately 6:55 a.m. to 7:45 a.m. and observed 527 people entering through MBI's main entrance.  I have

also reviewed MBI's payroll records for the quarter ending September 30, 2006, and they list many of the individuals who either told MBI officials or the UCA that they were here unlawfully in the United States, or who were identified through our surveillance of vehicles in the employee parking lot in May of 2006, including: Susana Gutierrez (no pay rate listed), referenced in Paragraph 11; Carlos Rosa ($6.75/hr.), referenced in Paragraph 15; Paulina Coxic/Coshik ($7.00/hr.), Morena Alvarado ($7.00/hr.), Manuel Sam ($7.75/hr.), and Maritza (Marisa) Ramos ($7.00/hr.), all referenced in Paragraph 19; and Maria Toj ($7.25/hr.), Maria Linares ($7.50/hr.), and Sergio Vivane (Viviani)(no pay rate listed), all referenced in Paragraph 24.   In addition, on February 6, 2007, I conducted a survey of vehicles in MBI's parking lot and observed both vehicles registered to Andres Ciprian who, as noted in Paragraph 24, was deported from the United States in 2004 and has never sought or obtained permission to reenter or work in the United States.

36.   In light of the foregoing, including the CW's information, the UCA's interactions with INSOLIA, FIGUEROA, COSTA and MELO, the ability of the UCA and CW to easily obtain counterfeit identification documents following advice from FIGUEROA and an MBI supervisor, the considerable number of MBI employees who identified themselves to the UCA as an illegal alien in the course of just four days, the number of vehicles of

21

MBI employees registered to unlawful aliens, FIGUEROA's
unwillingness to hire citizens and legal residents because of
INSOLIA's preference for illegal aliens, and the fact that the
percentage of MBI's workforce possessing a deficient social
security number has risen steadily along with MBI's receipt of
the very lucrative military contracts from 44 percent in 2004, to
58 percent in 2005, to an astounding 66 percent in 2006, I
believe that INSOLIA, through and along with FIGUEROA, COSTA and
MELO, has intentionally hired hundreds of unlawful aliens since
2004 in order to maintain a cheap workforce large enough to
fulfill his obligations under the valuable military contracts.

37. Accordingly, I have probable cause to believe that from on or about January 1, 2004, to on or about March 1, 2007, Francesco INSOLIA, Ana FIGUEROA, Dilia COSTA, and Gloria MELO, have conspired with each other to encourage or induce aliens to work at MBI, and thus reside in the United States, knowing or in reckless disregard of the fact that such residence is or would be illegal, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I), and have in addition conspired to knowingly hire unauthorized aliens, or to continue to employ aliens knowing the aliens are or have become unauthorized to work, in violation of 18 U.S.C. § 371.

I certify that the foregoing is true and correct. Executed at Boston, Massachusetts, this 5th day of March, 2007.

Melvin H. Graham

MELVIN H. GRAHAM
Special Agent
U.S. Department of Homeland Security,
Immigration and Customs Enforcement

Subscribed and sworn before me this 5th day of March, 2007, in Boston, Massachusetts.

LEO T. SOROKIN
United States Magistrate Judge

23